**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

|  |  |
|---|---|
| Plaintiff, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA LIQUIDATION |
| | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, | |
| Defendant. | |

---------------------------------------------------------X

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

Plaintiff,

Adv. Pro. No. 10-05342 (BRL)

v.

MAXAM ABSOLUTE RETURN FUND,
L.P.; MAXAM ABSOLUTE RETURN
FUND, LTD.; MAXAM CAPITAL
MANAGEMENT LLC; MAXAM CAPITAL
GP LLC; SANDRA L. MANZKE
REVOCABLE TRUST; SANDRA L.
MANZKE, as trustee and
individually; SUZANNE
HAMMOND; WALKER MANZKE; AND
APRIL BUKOFSER MANZKE.

Defendants.

---------------------------------------------------------X

**APPEARANCES**:

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
By:    David Sheehan
       Marc D. Powers
       Deborah H. Renner
       Loura L. Alaverdi

S. Jeanine Conley
Keith R. Murphy
James W. Day

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and
Bernard L. Madoff*

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200;
Fax: (212) 488-1220
By:     Jonathan D. Cogan
        Michael S. Kim
        Carrie A. Tendler

1919 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 664-1900;
Fax: +1 202 664 1920
By:     Maggie Sklar

*Attorneys for MAXAM Absolute Return Fund Limited*

Before: Hon. Burton R. Lifland
        United States Bankruptcy Judge

## BENCH MEMORANDUM DETERMINING TRUSTEE'S MOTION FOR ENTRY OF AN INJUNCTION

Before the Court is the motion (the "Motion") of Irving H. Picard, Esq. (the "Trustee" or

"Picard"), trustee for the substantively consolidated Securities Investor Protection Act[1] ("SIPA")

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff

("Madoff"), pursuant to sections 362(a) and 105(a) of title 11 of the United States Code, 11

U.S.C. § 101 et. seq. (the "Code"), Rule 7065 of the Federal Rules of Bankruptcy Procedure (the

"Rules"), and SIPA § 78eee(b)(2), seeking (i) entry of an order enforcing the automatic stay of

the Code, the provisions of SIPA prohibiting suits against the Trustee, and the Stay Orders (as

---

[1] 15 U.S.C. §§ 78aaa *et seq.* References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

defined below) of the United States District Court for the Southern District of New York (the

"District Court"), and declaring that the action filed by Maxam Absolute Return Fund, LTD

("Maxam Limited" or the "Defendant") against the Trustee in the Grand Court of the Cayman

Islands on or about July 11, 2011 (the "Cayman Action") violates the automatic stay and is void

*ab initio* and (ii) the issuance of an injunction prohibiting Maxam Limited from pursuing the

Cayman Action.

The Cayman Action is a clear attack on this Court's exclusive jurisdiction and a blatant

attempt to hijack the key issues to another court for determination.  It is a thinly-veiled effort to

forum-shop and ultimately wrest control over the Trustee's claims from this Court.  Upon review

of the papers and after oral argument, the Trustee's motion is therefore GRANTED.

## BACKGROUND

On December 8, 2010, the Trustee filed a complaint (the "Complaint") against several

Maxam funds seeking the avoidance of certain transfers, including the recovery of subsequent

transfers to Maxam Limited.  Two of the other funds named in the Trustee's Complaint are

central to the matter at hand – Maxam Capital Management, LLC ("Maxam Capital") and Maxam

Absolute Return Fund, L.P. ("Maxim Fund").  The former acted as Maxam Limited's "Investment

Manager" and the latter as its "Master Fund."  That is, Maxam Capital was authorized through an

Investment Management Agreement dated July 1, 2006, (the "Investment Management

Agreement") to provide investment advice to Maxam Limited, which deposited all of its assets

with Maxam Fund.[2]

---

[2] Both Maxam Capital and Maxam Fund had accounts with Bank of America and their principal places of business
in Connecticut.  Maxam Fund also opened a direct account with BLMIS in New York in July of 2006 with the
account number 1M0232 (the "BLMIS Account").

Between 2006 and 2008, nearly $100 million was transferred from BLMIS to Maxam Fund in the form of withdrawals.  During the 90 days prior to December 11, 2008 (the "Filing Date"), three transfers totaling approximately $25 million were made to Maxam Fund (the "Preference Period Transfers").   Compl. ¶ 153, ¶ 156.  And based on correspondence from Maxam Fund's counsel to the Trustee, the latter has determined that some or all of the Preference Period Transfers were subsequently transferred to Maxam Limited.   Compl. ¶ 157.  In the Complaint, the Trustee seeks the return of these funds.

On May 20, 2011 Maxam Limited entered into a stipulation (the "Stipulation") that extended the time for all Defendants to answer the Trustee's Complaint.  The Stipulation was so ordered by this Court on May 20, 2011 and there is no dispute that it benefitted Maxam Limited and the other Defendants.

On July 11, 2011, Maxam Limited filed its Answer to the Trustee's Complaint.  On or about the same day, Maxam Limited filed the Cayman Action seeking (i) a declaration that Maxam Limited is not liable to the Trustee for either the $25 million Maxam Limited received from Maxam Fund within the period of 90 days prior to the Filing Date or any amounts in excess of the $25 million that Maxam Limited received from Maxam Fund within the period of two years prior to December 11, 2008, as well as (ii) costs and any other relief the Court deems proper.

## DISCUSSION

### I.   THE CAYMAN ACTION VIOLATES THE AUTOMATIC STAY, THE STAY ORDERS, THE BARTON DOCTRINE, AND SIPA

#### A.  The Automatic Stay

The commencement of a SIPA liquidation operates as an automatic stay of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or

proceeding against the debtor," or "any act to obtain possession of . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3); SIPA § 78fff(b) (applying chapter 3 of Title 11).  Property of the estate, in turn, includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), "wherever located and by whomever held," 11 U.S.C. § 541(a).  "The term 'all legal and equitable interests of the debtor in property' is all-encompassing and includes rights of action as bestowed by either federal or state law." *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 257–58 (5th Cir. 2010).  Property of the estate therefore includes any cause of action the debtor had on the petition date, *see Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010), as well as avoidance actions created on the petition date, *see Delgado Oil, Inc. v. Torres*, 785 F.2d 857 (10th Cir.1986) (holding creditor has no standing to assert post-petition preference action because such action is property of the estate); *In re Chrysler LLC*, No. 09-50002, 2009 WL 1360863, at *1 (Bankr. S.D.N.Y. May 04, 2009) (granting security interests in "all property of the estates of each of the [d]ebtors within the meaning of section 541 of the Bankruptcy Code (*including avoidance actions arising under chapter 5 of the Bankruptcy Code* and applicable state law")) (emphasis added); *Peltz v. Gulfcoast Workstation Group (In re Bridge Information Systems, Inc.)*, 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003) ("Thus, both Debtor's counterclaim . . . and the [p]reference [a]ction are property of the estate under § 541(a).").

Maxam Limited therefore violated the stay by usurping causes of action belonging to the estate under sections 362(a)(3) and 541 of the Code.  As property of the estate, the Trustee has discretion whether to bring the cause of action and, if not statutorily limited to a specific jurisdiction, to choose forum to bring it in.  Here, the Trustee commenced the Avoidance Action in this Court; by starting the Cayman action, Maxam Limited has thus interfered with the

Trustee's chosen forum for litigation and unlawfully attempted to exercise control over the Avoidance Action.

As discussed previously by this Court, the automatic stay is one of the most fundamental bankruptcy protections and applies broadly to "give[] the debtor a breathing spell" and to prevent creditors from "obtain[ing] payment of the[ir] claims in preference to and to the detriment of other creditors." *Picard v. Fox (In re BLMIS)*, 429 B.R. 423, 430 (quoting H.R. REP. NO. 595, 95th Cong. 1st Sess. (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 49 (1978), *as reprinted in* 1978 U.S.C.C.A.N., 5835, 5963, 6010, 6296–97.   In this SIPA proceeding, the stay protects customers of BLMIS by fostering fair, uniform, and efficient distribution of customer property. If the Cayman Action continues, the Trustee will be required to expend duplicative time and resources to essentially re-litigate the merits of the Avoidance Action in the Cayman Action. This type of activity is precisely what the stay intends to prevent.   *See Lickman v. Henkel (In re Lickman)*, 297 B.R. 162, 170–71 (Bankr M.D. Fla. 2003) (finding debtor making telephone calls, writing letters, filing disciplinary complaints with The Florida Bar, and seeking legal relief in Pennsylvania state and federal courts in order to convince the trustee  to release estate property violative of the stay because "[t]he stay applies to attempts to obtain control over tangible and intangible property. It also protects causes of action that are vested in the trustee.") (internal citation and quotations omitted).

Relying on an unreported decision, *AW Treuhand Gmbh Wirtschaftsprufungsgesellschaft Steuerberatungsgesellschaft v. Peregine Systems, Inc. (In re Peregrine Systems, Inc.)* ("*Peregrine*"), Maxam Limited argues unconvincingly that the Cayman Action does not violate the automatic stay. Nos. 02-12740, *et al.*, 2005 WL 2401955 (D. Del. September 29, 2005).   In that case, the court found that the defendant's action in Germany seeking a declaration that it was

6

not liable to the debtor for breach of contract action brought by the debtor in a California court did not violate the automatic stay. However, *Peregrine* only analyzed section 362(a)(1) of the Code, which stays any "action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case," and found that the German suit did not violate that section because it could not have been brought prepetition. *In re Peregrine Systems, Inc.*, 2005 WL 2401955 at *3. *Peregrine* never discussed the issue this Court is deciding: whether a foreign action seeking declaratory relief from a debtor's claim is an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" stayed by section 362(a)(3) of the Code.

Accordingly, as the Cayman Action is violative of the automatic stay, it is void *ab initio*. *See* 11 U.S.C. § 541(a) ("[Property of the estate] is comprised of all the following property, *wherever located and by whomever held*.") (emphasis added); *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 137 (2d Cir. 1992) ("[A]ctions taken in violation of the stay are void and without effect.") (citing *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 369 (Bankr. E.D.N.Y. 2009) (holding action in Israel violative of the automatic stay and therefore void); *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 863 (Bankr. C.D.Cal. 2008) ("The United States automatic stay applies worldwide, whether or not this is consistent with domestic law in the relevant foreign country."); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) ("The Court finds, however, that based upon the applicable Code sections, other indicia of congressional intent and case law in this district, the automatic stay applies extraterritorially.").

### B.  The Stay Orders

Moreover, in light of the foregoing analysis, the Cayman Action violates at least one stay order of the District Court in connection with the ongoing SEC litigation related to the instant matter.  The District Court's order entered December 15, 2008 (the "December 15, 2008 Stay Order") declared that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]," and that "any other suit against any receiver, conservator or trustee of [BLMIS] or its property . . . is stayed."  *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), Docket No. 4, at ¶¶ IV, V; *see also* Order On Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, Docket No. 8, at ¶ IX (the "December 18, 2008 Stay Order") ("no creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the control, possession, or management of the assets subject to the receivership."); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, Dkt. No. 18, at ¶ IV (incorporating and making permanent the December 18, 2008 Stay Order) (the "February 9, 2009 Stay Order," and together with the December 15, 2008 and December 18, 2008 Stay Orders, the "District Court Stay Orders").  Accordingly, the Cayman Action not only violates the automatic stay, but also directly contravenes at least the December 15, 2008 Stay Order.

### C.  The Barton Doctrine

In addition, the Cayman Action violates the *Barton* doctrine, which was created from common law by the Supreme Court in *Barton v. Barbour*, 104 U.S. 126 (1881).  There, the Court held that before suing a court-appointed receiver, the petitioning party must first seek leave of the court that appointed him or her.  Id.  This doctrine has become a black letter one: "An

unbroken line of cases . . . has imposed [the *Barton* doctrine] as a matter of federal common law." *Katz v. Kujec (In re Biebel)*, No. 08-3115, 2009 WL 1451637, at *3 (Bankr. D. Conn. 2009) (*citing In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998); *see also Chicago Title & Trust Co. v. Fox Theatres Corp.*, 69 F.2d 60 (2d Cir. 1934) ("[Receivers] are officers of the court, and concededly cannot be sued without the court's consent.").  Needless to say, the doctrine has been observed in the post-receivership context and has been extended to bankruptcy trustees.  *See Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996) (noting the "well-recognized line of cases" extending the *Barton* Doctrine to a bankruptcy trustee); *see also In re General Growth Prop., Inc.*, 426 B.R. 71, 74 (Bankr. S.D.N.Y. 2010) (finding "an action against the Board, whose members act as officers of the court, implicates the *Barton* doctrine").  And where the doctrine is violated, "[t]he only appropriate remedy . . . is to order cessation of the improper action." *Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 970 (9th Cir. 2005) (internal quotations omitted).

## D.  SIPA

Finally, the Cayman Action violates several sections of SIPA.  Sections 78eee(b)(2)(A)(i) and (b)(2)(A)(ii) of SIPA provide that this court has "exclusive jurisdiction of BLMIS and its property, wherever located (including property located outside the territorial limits of such court . . .)" and "exclusive jurisdiction of any suit against the trustee with respect to a liquidation proceeding." Thus, the Cayman Action violates these provisions by naming the Trustee as a defendant in the Cayman Action and attempting to assert control over BLMIS property and by seeking to impose costs and fees against the Trustee.

## II. THE CAYMAN ACTION IS ENJOINED PURSUANT TO SECTION 105(A) OF THE CODE

### A. Personal Jurisdiction

Courts have the power to enjoin litigants subject to their jurisdiction from proceeding with an action in a foreign jurisdiction. *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987). To be valid, a court's exercise of jurisdiction must be "consistent with the Constitution and laws of the United States." Rule 7004(f); *see also GMAM Inv. Funds Trust I v. GloboComunicações e Participações S.A. (In re GloboComunicações e Participações S.A.)*, 317 B.R. 235, 251 (Bankr. S.D.N.Y. 2004). This broad mandate has been analyzed in terms of due process, with courts finding that the "worldwide service of process" permitted by Bankruptcy Rule 7004(f) is "limited only by the due process clause of the fifth amendment." *Federalpha Steel LLC Creditors' Trust v. Fed. Pipe & Steel Corp. (In re Federalpha Steel LLC)*, 341 B.R. 872, 887 (Bankr. N.D. Ill. 2006) (quoting *North v. Winterthur Assurances (In re North)*, 279 B.R. 845, 853 (Bankr. D. Ariz. 2002)). The corresponding analysis is a two-step one: A bankruptcy court's valid exercise of jurisdiction over a foreign defendant depends first on whether that defendant has "the requisite minimum contacts with the United States at large." *Picard v. Chais (In re Bernard L. Madoff Investment Securities LLC)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010) (*citing Cruisephone, Inc. v. Cruise Ships Catering & Servs., N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002)); *see also Savage & Assocs., P.C. v. Banda 26, S.A. (In re Teligent, Inc.)*, Nos. 01-12974, *et al.*, 2004 WL 724945, at *4 n.11 (Bankr. S.D.N.Y. Mar. 30, 2004); *In re North*, 279 B.R. 845, 852–53 (Bankr. D. Ariz. 2002) (noting the defendant must have contacts "with the United States" but need not have them "with the forum state"). And should such contacts be found to exist, the court then conducts a "reasonableness" inquiry to determine whether its exercise of jurisdiction will offend "traditional

notions of fair play and substantial justice." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal.*, 480 U.S. 102, 113, (1987) (internal quotations omitted); *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

A court is said to have *specific* jurisdiction over a foreign defendant who "purposefully direct[s] his activities at residents of the forum" and where the underlying cause of action "arise[s] out of or relate[s] to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, (1985) (internal quotations omitted) (providing these considerations in light of, *inter alia*, their contributing to a defendant receiving "fair warning"). The defendant's activity need not have taken place within the forum, *Id.* at 476, and a single transaction with the forum will suffice. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, (1957). However, "it is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, (1958). As can be seen from the following, defendant Maxam Limited has been and remains a "player" in the BLMIS and related proceedings.

1.  <u>Minimum Contacts</u>

Given this framework, and given Maxam Limited's entering into and performing under the Investment Management Agreement with its New York choice of law clause as well as directing investments to the United States, the Court cannot escape the conclusion that it has specific jurisdiction over Maxam Limited.

The Second Circuit has indicated that entering into a contract with a New York choice of law clause is "a significant factor in a personal jurisdiction analysis because the parties . . . invoke the benefits and protections of New York law." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004); *AIG Financial Products Corp. v. Public Utility Dist. No. 1 of*

*Snohomish County, Wash.*, 675 F. Supp. 2d 354, 364 (S.D.N.Y. 2009).  Maxam Limited entered into and performed under the Investment Management Agreement, which included such a clause: "[t]his Agreement shall be governed by, and construed in accordance with, the substantive laws of New York applicable to contracts made and to be performed entirely therein without regard to any conflict of laws principles, and the parties hereto hereby *consent to the non-exclusive jurisdiction of the New York courts*."  Declaration of Marc D. Powers in Support of Trustee's Application by Way of Order to Show Cause Why An Injunction Should Not Issue filed by Marc D. Powers on behalf of Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L.Madoff [hereinafter "Powers Declaration"], Ex. I, ¶ 16 (Dkt. No. 42) (emphasis added).

The same Investment Management Agreement references an Information Memorandum for Maxam Fund, dated July 1, 2006, (the "Maxam Fund Information Memorandum").  That Memorandum is identical in relevant part to the one for Maxam Limited, dated March 3, 2008 (the "Maxam Limited Information Memorandum"), which suggests Maxam Limited directed investments to the United States: *All* assets in Maxam Limited were to be placed into Maxam Fund, which utilized "the services of the Investment Manager to allocate [its] assets . . . to Broker Dealers."  Powers Declaration, Ex. K, at 1; *see also* Compl. ¶ 38.  And furthermore, the Information Memorandum lists Maxam Capital, with its *Connecticut* address, as the "Investment Manager," Powers Declaration, Ex. K, at (iv), and sets out:

> The Investment Manager will provide the selected Broker Dealer with the authority to trade securities that are in the Standard & Poor's 500 Index on a discretionary basis.  The Investment Manager will also open [sic] Option Accounts wherein the Investment Manager will grant the selected Broker Dealers the authority to trade options in accordance with the Broker Dealer's trading strategy.  Such options transactions will be used as a hedge against the long positions.

Powers Declaration, Ex. K, at 2.  In addition, it has been represented to this Court that Maxam Fund was a BLMIS "feeder fund." Memorandum of Law in Support of the MAXAM Defendants' Motion to Withdraw the Reference, ¶¶ 5, 38, 40, (Dkt. No.18).  And finally, the Trustee contends, Maxam Limited engaged in a series of repeated transactions that intentionally channeled investor money into the BLMIS Ponzi scheme in New York.

Furthermore, several of the Trustee's claims "arise out of or relate to" these contacts with the United States such that Maxam Limited "should reasonably anticipate adjudication of these transactions to take place" here. *Chais*, 440 B.R. at 279 (Bankr. S.D.N.Y. 2010) (*citing Burger King*, 471 U.S. at 472).  Without Maxam Limited's transferring assets to and from the United States, there could not be claims for subsequent transfers against it.  *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 914 (9th Cir.1990) ("An action arises out of contacts with the forum if, 'but for' those contacts, the cause would not have arisen."); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F.Supp.2d 717, 730 (S.D.N.Y. 2003) (citing the "but for" test for specific jurisdiction).[3]

Finally, there are also participatory factors indicating Defendants consent to personal jurisdiction in this adversary proceeding. In *Deak & Co., Inc.*, 63 B.R. 422, 431 (Bankr. S.D.N.Y. 1986), this Court found that the defendants effectively consented to personal jurisdiction by purposefully availing themselves of the protections afforded by United States bankruptcy law.  In *Deak*, as here, defendants participated in the bankruptcy case by filing a notice of appearance and attending court hearings through their New York counsel. *Id.* at 431. The Maxam Limited further participated in the instant adversary proceeding by entering into the

---

[3] While there is a split among circuits in the standard employed to determine whether a cause of action "arises out of or relates to" a defendant's contacts, Second Circuit cases have been summarized as holding that the degree of "relatedness" required varies in relation to the "overall picture" of the defendant's contacts. *See Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07–CV–2360, 2008 WL 169358, at *10 (S.D.N.Y. Jan. 16, 2008).  Here, the causes of action are so related to the contacts at issue that specific jurisdiction is supported under any of these tests.

Stipulation, which could support a finding of consent to jurisdiction here.  But in any event, the

Defendants' extensive contacts with the forum, as outlined above, establish such jurisdiction.

2.   Reasonableness

Determining whether jurisdiction would be unreasonable under the circumstances entails

an examination of, *inter alia*, the following factors: (1) the burden that the exercise of

jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the

case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the

shared interest of the states in furthering social substantive policies.  *Asahi*, 480 U.S. at 113,;

*Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999). Here, these factors weigh in

favor of this Court finding jurisdiction over Maxam Limited.

While courts recognize a potential burden given a location abroad, "often the interests of

the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens

placed on the alien defendant."  *Asahi*, 480 U.S. at 114; *see also First Capital Asset Mgmt., Inc.*

*v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 403 (S.D.N.Y. 2002) (finding personal jurisdiction over

Swiss defendant despite "significant" burden). Such a burden, however, could hardly be said to

obtain here, where Maxam Limited's counsel is in New York and there is a U.S. nexus to its

economic activities, and given that "the conveniences of modern communication and

transportation" also militate against finding hardship based on lack of proximity.  *Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro.*

*Life*, 84 F.3d at 574).   Moreover, the United States has a strong interest in applying the

fraudulent transfer and preference provisions of its Bankruptcy Code since the Trustee's claims

arise under it, and Defendants' transfers have allegedly deprived United States' creditors of

14

distributions to which they are entitled in the BLMIS liquidation. *See U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.),* 68 B.R. 690, 699 (Bankr. S.D.N.Y. 1986) (finding that United States had a strong interest where claim arose solely under United States bankruptcy law); *First Capital,* 218 F. Supp. 2d at 403 (finding that New York had a strong interest in seeing its fraudulent conveyance law applied where defendants' transfers allegedly frustrated New York judgments). The Trustee also has a strong interest in litigating in the United States, as BLMIS was a New York corporation with its files in the United States. *See In re McLean,* 68 B.R. at 699 (finding that jurisdiction was reasonable where files pertaining to the transaction were located in the forum). Finally, "the most efficient resolution of the controversy" would be in the United States, where the inextricably-related BLMIS liquidation is ongoing before this Court. *First Capital,* 218 F. Supp. 2d at 403 (quoting *Asahi,* 480 U.S. at 113–16).

Given the above, then, exercising jurisdiction over Maxam Limited could not be said to be unreasonable or run afoul of comporting with fair play and substantial justice.

**B. Continuation of the Cayman Action Threatens the Court's Jurisdiction and Interferes with the Administration of the Case, Warranting an Injunction under Section 105(a)**

Section 105(a) of the Code permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). Section 105 is not limitless, and thus "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." *Solow v. Kalikow (In re Kalikow)*, Nos. 08-5268-bk, 08-5274-bk, 2010 WL 1407159, at *11 (2d Cir. Apr. 8, 2010) (internal quotations and citations omitted). However, bankruptcy courts are empowered to utilize their equitable powers under section 105 where appropriate "to facilitate the

15

implementation of other Bankruptcy Code provisions." *Id.* (quoting *Bessette v. Avco Fin. Serv. Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)).

A substantial threat to this Court's jurisdiction warrants the issuance of a injunction pursuant to section 105(a) of the Code. Because injunctions under section 105(a) are authorized by statute, they need not comply with traditional requirements of Rule 65. *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987). Rather, a bankruptcy court may utilize section 105 of the Code to "enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it." *Johns-Manville Corp. v. Colorado Ins. Guar. Assoc. (In re Johns-Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (quoting *LTV Steel Co., Inc. v. Board of Ed. of the Cleveland City Sch. Dist. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988)).

As the Court presiding over the SIPA liquidation of BLMIS, this Court has sole jurisdiction over the administration and distribution of estate assets to customers. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate.") (citing 28 U.S.C. § 1334(e) (stating bankruptcy courts "shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate")); *see also* SIPA § 78eee(b)(2)(A)(i) ("Upon the filing of an application with a court for a protective decree . . . such court shall have exclusive jurisdiction of such debtor and its property wherever located . . . ."). In addition, this Court has "exclusive jurisdiction of any suit against the trustee with respect to a liquidation proceeding." SIPA § 78eee(b)(2)(A)(ii). In the Cayman

Action, Maxam limited seeks to insulate the transfer of customer property sought by the Trustee—a court appointed trustee charged by SIPA to recover and distribute customer property. The Cayman Action thus blatantly attempts to highjack this Court exclusive jurisdiction by granting another court jurisdiction to adjudicate the avoidance claims brought by the Trustee.

Furthermore, the Cayman Action frustrates the strong U.S. public policies outlined in SIPA. Congress enacted SIPA in 1970, in response to "a rash of failures among securities broker-dealers in the late 1960s that had resulted in significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings." *In re New Times Securities Services, Inc.*, 371 F.3d 68, 84 (2d Cir. 2004) (quoting *Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 66 (2d Cir. 2000). One of the central aims of SIPA is reinforcing investor confidence in the U.S. securities market by establishing a reserve fund to provide protection to customers of broker-dealers. *Id.* Future amendments to SIPA, such as increasing the amounts available to customers as part of SIPA advances, intended to address perceived "limitations . . . upon SIPC's ability to provide the type and degree of protection for securities customers for which SIPA was enacted. Specifically, these limitations in some cases impair the satisfaction of customers' claims as fully, promptly and efficiently as the Committee believes is desirable." *Id.* (citing *Investor Prot. Corp.*, 222 F.3d at 66). Indeed, "SIPA's main purpose is not to prevent fraud or conversion, but to reverse losses resulting from brokers' insolvency" and "*is intended to expedite the return of customer property*" *In re Bernard L. Madoff Inv. Securities LLC*, Dkt. Nos. 10-2378-bk, *et al.*, 2011 WL 3568936, at *9, 10 (2d Cir. August 16, 2011) (emphasis added). To facilitate the expeditious recovery of customer property and its return to investors, section 78eee(b)(2)(A)(B) of SIPA stays all proceedings against a trustee so the trustee can concentrate his time and efforts on recovering customer property and

not have to deal with peripheral issues.  Likewise, section 78eee(b)(2)(A)(ii) of SIPA grants exclusive jurisdiction to this Court to streamline a SIPA liquidation and prevent a trustee from wasting time litigating similar issues before disparate venues worldwide.  Notably, section 78eee, the section containing these provisions, is titled "*Protection of Customers*" reinforcing the premise that the intent of these sections is to protect customers and ultimately the securities industries, not merely to assist the trustee.  Accordingly, the Cayman Action cannot be viewed in a vacuum and the Court must look at the broader ramifications of its continuance.  The Trustee has filed over 900 adversary proceedings involving numerous foreign defendants seeking the return of customer property.  If every foreign defendant could seek declaratory relief in its own country it would significantly erode the intended protections of SIPA by delaying the rightful return of customer property, waste the Trustee's time and assets, and frustrate this Court's ability to fairly and uniformly distribute customer property to defrauded BLMIS customers as intended by SIPA.  Accordingly, the threat posed by the Cayman Action provides grounds for injunctive relief under section 105(a) of the Code.

### C.  Threat to the BLMIS Estate Warrants Extension of Section 362(a) of the Code

To the extent section 362(a) and the District Court Stay Orders do not apply in their own right to stay the Cayman Action, the damaging effects of the Actions on the estate warrant extending the stay pursuant to section 105(a) of the Code and well-settled Second Circuit precedent.  While section 362(a)(1) of the Code typically stays "proceeding[s] against the debtor," courts have consistently utilized section 105 to extend section 362 to third-party actions against non-debtor entities "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."  *Queenie, Ltd. v. NyGard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); *see also Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R.

401, 409 n.20 (S.D.N.Y. 2007) ("Courts consistently have found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief . . . ."); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) ("The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits . . . which may affect the amount of property in the bankrupt estate, or the allocation of property among creditors.") (internal quotations and citations omitted).

While the Cayman Action is styled as a claim against the Trustee, if successful, it will produce a result that will be binding on the BLMIS estate and prevent the Trustee from recovering customer funds transferred by BLMIS.   Accordingly, the Court finds that an extension of the stay is appropriate and necessary to preserve the integrity of the SIPA proceedings and prevent a potential diminution in recovery of customer property for the benefit of the BLMIS estate and all of its customer claimants.

### D. Enjoining Maxam Limited from Continuing the Cayman Action is appropriate under Section 105 of the Code.

Maxam Limited argues that despite its violations of the Stay and SIPA, an injunction of a foreign proceeding must always satisfy the multi-factor, foreign anti-injunction standard outlined in *China Trade*.   However, given that the foreign proceeding in *China Trade* did not violate any law of the United States or interfere with the exclusive jurisdiction of a U.S. court, this Court finds the comity-based *China Trade* factors inapplicable to the instant proceeding.   Maxam Limited cannot use notions of international comity to undermine this Court's exclusive jurisdiction and interfere with the administration of the estate.   *See Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956, 963 (7th Cir. 1996) ("Comity is a doctrine of adjustment, not a mandate for inaction.")

Even assuming every injunction affecting a foreign proceeding must meet the *China Trade* factors, enjoining Maxam Limited from continuing the Cayman Action is warranted thereunder. *China Trade* outlines a two-step inquiry for enjoining a foreign proceeding. First, an injunction may be imposed only if "(A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007) (internal quotation marks omitted) (citing *China Trade*, 837 F.2d at 35). These factors are obviously satisfied here; both suits involve the Trustee and Maxam Limited, and resolution of the Trustee's action in this Court is dispositive of the Cayman Action which seeks a determination of non-liability in the Trustee's action. Once these factors are met, the additional factors to be considered under *China Trade* are:

> (1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment.

*Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (citing *China Trade*, 837 F.2d at 35). The factors weighing most heavily in the *China Trade* calculus are threats to the enjoining forum's jurisdiction and to its strong public policies. *China Trade*, 837 F.2d at 36.

Here, the Cayman Action would be vexatious because it forces the Trustee to litigate issues already pending in front of this Court in another forum. While vexatiousness is "likely to be present whenever parallel actions are proceeding concurrently," the Cayman action is particularly so. The Trustee's Action against Maxam and its related entities seeks almost $100 million, and the Cayman Action attempts to litigate Maxam Limited's liability as subsequent transferee of $25 million. As the liability of the other Maxam defendants would still be adjudicated in this Court regardless of the outcome in the Cayman one, continuation of any

20

proceeding in the latter means any re-litigation of the same legal issues therein would truly be for naught.  Likewise, the need to litigate the same issues in both this Court and the Cayman Action will result in delay, inconvenience, expense, and inconsistency.  Finally, as discussed above, the Cayman Action threatens to erode the strong public policies underlying SIPA, namely, protecting investors and their faith in the securities market by expeditiously returning customer funds to investors.  Accordingly, enjoining the Cayman Action satisfies the *China Trade* factors and is warranted.

## CONCLUSION

As set forth herein and at oral argument, this Court finds the Cayman Action directly violates the automatic stay, at least one of the District Court Stay Orders, SIPA, and the Barton Doctrine, and is therefore void *ab initio*.  Additionally, Maxam Limited shall be enjoined from proceeding with the Cayman Action.  And accordingly, for all the reasons set forth herein, the Trustee's Motion is hereby GRANTED.   The Court will enter an order simultaneously herewith.


Dated: New York, New York
       October 12, 2011

                                        /s/ Burton R. Lifland
                                        United States Bankruptcy Judge